(C.D. 2502)

C. J. Tower & Sons of Buffalo, Inc. *v.* United States

United States Customs Court, First Division

(Decided January 12, 1965)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Earl R. Lidstrom* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Morris Braverman* and *Mollie Strum*, trial attorneys), for the defendant.

Before OLIVER, WILSON, and NICHOLS, Judges

NICHOLS, Judge: The merchandise involved in these cases, consolidated at the trial, consists of pieces of marble from Italy, entered on various dates between June 2, 1958, and May 23, 1960, and assessed with duty at various rates under paragraph 232(d) of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, as marble, wholly or partly manufactured into articles, not specially provided for. It is claimed that the merchandise is properly dutiable at various rates dependent upon thickness under paragraph 232(b) of said tariff act, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T.D. 52373, supplemented by T.D. 52476, as slabs of marble, polished in whole or in part.

Paragraph 232, as so modified, provides as follows:

| Tariff Act of 1930, paragraph | Description of Products | | Rates of Duty | |
|---|---|---|---|---|
| 232(b) | Slabs and paving tiles of marble, breccia, and onyx: Containing not less than four superficial inches: | | | |
| | *   *   *   *   *   *   * | | | |
| | If polished in whole or in part (whether or not rubbed): | | | |
| |     If not more than one inch in thickness__ | | 7¢ per superficial ft. | |
| |     If more than one inch and not more than one and one-half inches in thickness___ | | 8¢ per superficial ft. | |
| |     If more than one and one-half inches and not more than two inches in thickness_ | | 9½¢ per superficial ft. | |
| | *   *   *   *   *   *   * | | | |
| 232(d) | | [effective | B 6/30/57 | C 6/30/58] |
| | Marble, breccia, and onyx, wholly or partly manufactured into monuments, benches, vases, and other articles, and articles of which these substances or either of them is the component material of chief value, not specially provided for_____ | | 22½% ad val. | 21% ad val. |

The only witness called at the trial was Attilio DeSpirt, president of DeSpirt Mosaic & Marble Co., for whose account the merchandise was entered. This firm contracts for marble work and imports and manufactures marble; it estimates the marble work in a building according to plans and specifications, acquires marble from abroad or at home, and installs it. The witness himself has been in the business for about 40 years and has ordered marble and visited the installation sites.

The invoice covered by protest No. 59/23728 describes the merchandise as Bethlehem Steel Job, 36 cases containing Loredo Clair with Garnet Marble, polished on all sides in sight, wall lining. Several pages of specifications follow. The merchandise was acquired for installation in the lobby of the Bethlehem Steel Building in Lackawanna, N.Y., in accordance with an order received from John W. Cowper Co., general contractor. The latter gave DeSpirt a set of plans and specifications for the entire building; from it their draftsman drew further plans for the marble work in the lobby, specifying a number for each piece that was to go into the job. The specifications and numbers were then sent to the manufacturer in Italy. Each piece of marble that was shipped here was marked with a number to correspond to the number on the plan, so that the workmen would know how to place the pieces.

The slabs, as imported, had been cut to the specified size and polished on the surface which would be visible after installation. Certain pieces to be used in the columns were also polished on the edges. None of the top and bottom edges was polished. In addition, slabs in miscellaneous sizes were included to take care of any breakage or any piece that might not fit. Other pieces were ordered long to take up any variance in the wall that might occur. Those were cut on the job to fit the building. Most of the pieces were rectangular; two were square; and some were rounded. The dimensions appear on the invoice; none was over 7/8ths of an inch thick. After importation, the pieces were, in fact, installed in the Bethlehem Steel Office Building in Lackawanna, N.Y. Pieces, if any, that were left over were brought back to the plant and put in stock.

There was received in evidence as defendant's exhibit A a photograph of the lobby with the marble installed. This shows the imported marble covering the walls, and a black base which was not included in the importation. The wainscotting went right up to the ceiling and all around the lobby. There is also a receptionist's desk made of the imported marble, having a rounded front.

A part of the stairs, called the stringer, was also of marble and rounded. The witness identified the rounded pieces, and the over-

length pieces. According to the witness, the columns were bevelled in Italy and had notches in the corners to enable the pieces to butt together. Some of the marble for the columns was replaced by other marble to make a better match. This was one of the uses for the extra pieces. The extra pieces were also needed where the exact sizes of the walls were not known.

The merchandise covered by entry No. 6464 in protest No. 60/22102 is described on the invoice as slabs for shower partitions. According to the witness, it was used as marble partitions to divide the compartments of toilet stalls in the Chickawauka High School, Chickawauka, N.Y. The pieces were rectangular and were polished on two faces but not on the edges with the exception of the stiles (the front pieces that hold the partitions), which were polished on all edges, except the top and bottom. The work was ordered by the Siegfried Construction Co. and DeSpirt's draftsmen provided exact measurements for the job. The marble was ordered from Italy according to the draftsmen's specifications so that the workmen would have to follow the drawing only. Each case contained a specified number of pieces with exact dimensions as ordered and the merchandise was used in its imported condition for the purpose for which it had been acquired. The pieces fitted into the job as planned. There was no overage ordered for breakage because this type of marble is standard, and the firm keeps a stock in its plant.

The merchandise in entry No. 182, also covered by protest No. 60/22102, consisted of marble partitions for the same kind of job. The pieces were rectangular and were ordered according to drawings and numbered so that the workmen merely followed the design.

The merchandise covered by protest No. 61/8668 also consisted of marble partitions for toilet rooms. The work was ordered for St. Gregory's School by Balling Brothers, who gave DeSpirt a set of plans drawn by architects. DeSpirt's draftsmen completed the plans for the marble before ordering it from Italy. The pieces were numbered according to the drawings; the sizes on the invoice were the ones ordered and received.

According to the witness, the marble pieces in these importations could not be used for other purposes in their imported condition. With further fabrication, they could "mostly" be salvaged for use as smaller pieces for window sills, marble saddles, or small pieces around a fireplace; there was a possibility that the merchandise could be used for tabletops or some allied use of the kind. The imported pieces were, in fact, ordered in accordance with a plan showing the marble required. Where the job requires a particular type of marble that

the firm does not carry commercially, more slabs than required are ordered, to allow for breakage and mistakes, but if the job calls for standard types, such as used for partitions, replacements, if needed, are made from stock. The firm never carried in stock marble slabs of the dimensions appearing on the invoice covered by protest No. 59/23728.

After the merchandise arrived, the only thing that remained to be done was for the workmen to assemble it for the purpose for which it had been ordered, provided the pieces fitted exactly. In some cases, a building will vary, but the importer tries to fit the specifications according to the architects' plans so far as humanly possible. Plans are made to exact size so that the marble will fit the job it is intended for and will not be wasted.

The issue in the instant case is whether the imported pieces are classified as slabs of marble, polished, or whether they have been so processed as to have become marble, wholly or partly manufactured into articles. Plaintiff claims that the rectangular pieces covered by protest No. 59/23728 would have been classified as polished slabs if they had not been ordered for installation in the lobby of the Bethlehem Steel Building and that the importation did not amount to a knocked-down wainscot. It is also claimed that marble pieces of the size and shape of those used in toilet partitions have been held to be marble slabs. Defendant contends, however, that the marble was ordered by dimension for specific jobs; that it could not be used for other purposes except salvage; and that it did not consist of pieces of general utility.

As was pointed out in *Atlas Export Co., F. L. Kraemer & Co.* v. *United States*, 43 CCPA 122, C.A.D. 618, at pages 126–127:

> * * * it is abundantly clear that some of the items which Congress considered to be covered by paragraph 232(d) might still be called "slabs" in the general meaning of that term. For example, it can hardly be denied that partly manufactured marble benches, specifically mentioned in paragraph 232(d), would consist of "slabs." The same is true of the table tops, tombstones, and lamp bases, mentioned in the *Summary of Tariff Information.* * * *

The two competing provisions of the Tariff Act of 1930 thus may, in turn, according to extrinsic circumstances, cover merchandise that, viewed by itself alone, could be identical. Customs officers were required to take such circumstances into account and classify accordingly. Within the limits imposed by the rules of evidence, so must this court. Our decision on one entry is not *res judicata* for any other. Careful scrutiny of what the witnesses said in each case involving marble slabs may alone provide explanation for differences in the result reached. Under such circumstances, it is not surprising that the efforts hitherto of our appellate court and this court have not up to now made it possible to classify marble slabs without controversy

and litigation. That they, in fact, have not, is evidenced by the instant case and many others now on the calendars of this court.

In the following cases, the merchandise was held to be mere marble slabs: *United States* v. *Selectile Co., Inc., et al.*, 49 CCPA 116, C.A.D. 805; *United States* v. *General Shipping & Trading Co. et al.*, 44 CCPA 168, C.A.D. 656; *The A. W. Fenton Co., Inc.* v. *United States*, 44 Cust. Ct. 16, C.D. 2147.

In the *Selectile* case, the slabs were ordered to specific size and state of polishing, so that they could be most economically used for installation in homes and buildings. They were used for various purposes and were often cut to the correct dimensions. The larger pieces were used for a variety of purposes, including toilet partitions. Unlike the instant case, none was used in its condition as imported. They were held to be material in sizes most adaptable to the marble installation business.

The *General Shipping & Trading Co.* case, *supra*, involved pieces of marble, polished on one side, with holes drilled in the top edge to receive clamping devices for holding them in place. They were intended for use as a wainscot in a church and were ordered to specifications by measuring the space. The pieces were numbered to facilitate installation. Ten percent more material than needed was ordered, and the remainder was kept for repairs. According to the testimony, the importer just ordered so many slabs of a certain size; the holes on the top were not deep enough for use in the condition imported; the marble could be used any place for floors or any other item. The court said (p. 172):

> We are of the opinion that the merchandise, as imported, was merely marble slabs which, although ordered in particular sizes with a particular purpose in view, were still adapted for general use as slabs. Accordingly, they were not limited to use in wainscotting, as contended by the Government, since they could be used in a wainscot only by additional cutting, drilling, and shaping, with a portion of the marble left after those operations were completed.

The court stated further that a knocked-down article means that all parts are in final form, and it is only necessary to assemble them in order to produce a completed article. It held that material which is 10 percent in excess and still must be cut and drilled on the job and some of which is not actually used is not a knocked-down article. It pointed out that the fact that the slabs were cut to specification might be important if their shape were such as to render them useless for any other purpose. Since they were rectangular in shape and of general utility, they were held not to be marble manufactured into articles.

In the *A. W. Fenton* case, *supra*, it was established that before any marble was acquired, the consignee received an order for the construc-

tion or erection of a particular structure, such as a wall, wainscotting, or toilet stall, and blueprints were furnished calling for the specific pieces of marble needed. The structures were to be composed of rectangular or square flat pieces of marble. Some pieces had to be cut to fit because of variations in the building and to fit around corners and doors. Holes had to be drilled to receive the hardware used for fastening the pieces together. Some of the pieces were numbered so as to match the color and markings and some to conform to numbers on the blueprints. In every shipment, an excess of 10 percent of the pieces required was ordered to take care of breakage and for repair purposes. The court held that the merchandise consisted of marble slabs, stating (p. 18) :

It is clear from the record, however, that what was actually ordered and what was actually received by the ultimate consignee were given numbers of rectangular or square flat pieces of marble of specific dimensions of length, width, and thickness, and that the pieces were, in their imported condition, usable for any purpose for which marble of that description could be used. The record establishes that marble of rectangular or square shape is "always usable for any other place marble can be used."

In *United States* v. *Quality Marble & Granite Co. et al.*, 48 CCPA 50, C.A.D. 763, and in *Atlas Export Co., F. L. Kraemer & Co.* v. *United States, supra*, the merchandise was held to be marble or onyx manufactured into articles. In the case first cited, the merchandise consisted of square, rectangular, and round pieces of marble, polished on the edges and one face, and slightly rounded or blunted at the corners, thereby forming an arris. There was testimony that the rectangular pieces could be used for making various articles, such as pullman tops, fireplace hearths, and bench tops; that 90 percent of the round pieces were sold to furniture manufacturers for use as tabletops; that generally all of the pieces were used in their imported condition; that the arris limited the use of the marble and that if such a piece were to be used for paneling or for a butt edge, the arris would have to be eliminated; that the merchandise would have to be used in its imported condition if it were to retain the finished effect intended by the workmanship abroad. The court concluded (pp. 52–53) :

It has been established that ninety percent of the round importations have been manufactured for use as table tops and sold to furniture manufacturers in this country, that generally all of the importations are used in the condition in which they are imported, and that to use them otherwise would nullify part of the work which had already been done on them. We therefore are of the opinion that the merchandise is properly classifiable under paragraph 232 (d).

The *Atlas Export Co.* case, *supra*, involved square and circular pieces of onyx, polished on one flat side and all the edges. Each piece had a hole drilled in the center. The testimony established that the

pieces were used in the manufacture of different kinds of articles; that the hole not only advanced the merchandise toward its ultimate use but was essential for the actual use thereof in any of the finished products where it might be finally employed. In the course of the opinion, the court stated (pp. 125–126) :

Assuming, without deciding, therefore, that the imported merchandise might in some respects be termed "slabs," we turn to a consideration of the applicability of paragraph 232(d). Is the imported merchandise "wholly or partly manufactured into * * * articles"? We are in agreement with the majority of the court below in its holding that it is not necessary for merchandise to be dedicated to the manufacture of one specific article or class of articles to fall under paragraph 232(d). A significant fact to be noted is that the drilling of the hole in these articles is apparently the last manufacturing step that is performed on them. In most of the uses described by the witnesses, the only thing that remains to be done to the articles is an assembling step. * * *

    ＊        ＊        ＊        ＊        ＊        ＊        ＊

It is clear that Congress intended to include under paragraph 232(d) articles of the type imported here. If these articles are not lamp bases, they can certainly be said to be partly manufactured lamp bases, even though they may be usable for other purposes. * * * It is abundantly evident that "dedication" to a specific use is not essential to classification under paragraph 232(d).

Under these cases, the most significant factors in determining whether the imported merchandise consists merely of marble slabs or marble, wholly or partly manufactured into articles, are whether the imported slabs are assigned and were cut to occupy specific places in a detailed design; whether or not the merchandise as imported is of general utility and is equally available in various places where marble can be used, not just in a particular design; whether it is used in its condition as imported or must be further cut or shaped on the job; whether the last manufacturing step has been performed on the article *per se* prior to importation and there is nothing left to do but assemble it with other articles; whether excess pieces over those required for the job were imported.

All of the merchandise involved in these cases was classified by the collector as marble, wholly or partly manufactured into articles. His classification is presumptively correct, and the burden rests upon plaintiff to establish that it is erroneous and that the claimed classification is correct. *Dorward & Sons Co. et al.* v. *United States*, 40 CCPA 159, 162, C.A.D. 512; *Davies, Turner & Co.* v. *United States*, 40 CCPA 193, 194, C.A.D. 517; *United States* v. *G. Klein & Son*, 42 CCPA 73, 76, C.A.D. 574.

The record made in this case does not establish whether the quality or kind of marble involved is the same as in the cases cited, and the uncontroverted testimony herein differs, it appears, from that taken in those cases with respect to the possible alternate uses of marble

rectangles and squares not used as planned in the structures for which ordered. These differences detract from the guidance this court can derive from the cases cited.

The record suggests possible distinctions among the items here involved. Thus, the rectangles ordered for the school jobs, or most of them, are apparently standard stock dimensions, while those for the Bethlehem job are not. Furthermore, possible distinctions exist between the rounded items and others; also, between the items imported to be used as cut, those imported over length, and those extra items imported to safeguard against breakage and mistakes. However, plaintiff does not urge any separate classification of parts of shipments, in case all cannot be classified the same way. Furthermore, if items dutiable at different rates are mingled in the same shipment, without information to enable customs officers to ascertain the quantity or value of each class, the whole is dutiable at the highest rate applicable to any part. Section 508, Tariff Act of 1930, as amended. Accordingly, the court is not now required to winnow out the parts, if any there be, dutiable at lower rates.

While in a sense, the imported merchandise, except the curved pieces, may be denominated slabs, it is clear from the record that the importations did not consist in whole or major part of miscellaneous pieces to be kept in stock or to be used interchangeably for the various purposes for which marble might be required. All of the shipments were for specific installations and were ordered in the dimensions required by predetermined designs. As imported, each piece was marked with a number corresponding to the number on the plan. The pieces were polished on the face or faces and on the edges which would show after installation. The merchandise for the Bethlehem Steel Building included rounded pieces for the receptionist's desk and for stair stringers, which were obviously made for these specific uses and could not be used otherwise in their imported condition. The other pieces were square or rectangular, but, according to the witness, were not of the dimensions which his firm carried in stock. For the most part, the pieces were used in their condition as imported and were merely assembled and installed in accordance with the plans. A few pieces only were deliberately ordered long and had to be cut to fit the walls. Extra pieces were ordered and used in the Bethlehem Steel job and some were left over. The pieces in the toilet partitions, though rectangular and apparently of a standard type, carried in stock by the importer, were assembled in imported condition in accordance with the plans, with no pieces remaining over.

While the imported items may be marble slabs *per se*, each shipment was composed of pieces of marble, designed, manufactured, and dedi-

cated for use in a specific installation and so used. It is obvious that the pieces for the wainscot could have been used to cover a wall in another building, but it is equally obvious that some of the pieces, at least, would have had to be cut differently unless the room were exactly the same. It is more likely that the toilet partitions could have been used in other buildings, but still as toilet partitions, so far as appears. Plaintiff's own witness was positive that the pieces could not be used for other purposes without further fabrication.

In the *Quality Marble* case, *supra*, the marble pieces were held to be tabletops, and it was noted that their use otherwise would nullify part of the work that had been done on them. In the *Atlas Export Co.* case, *supra*, the court said that if the articles were not lamp bases, they were at least partly manufactured lamp bases.

In the instant case, the merchandise consisted of a wainscot and toilet partitions at least partly manufactured. The pieces are, therefore, not classifiable under the provision for marble slabs *per se*, but are more specifically provided for under paragraph 232(d), as modified, as marble, wholly or partly manufactured into articles.

The protests are overruled and judgment will be rendered for the defendant.